says "the greater negligence in a case of this kind is chargeable on the party who receives the bill from the perpetrator of the forgery," and, continuing, the same learned judge says:

"The party who fraudulently passed the bill cannot avoid his liability to refund on the pretense of delay in detecting the forgery, or in giving notice of it; and, if reasonable diligence is exercised in giving notice after the forgery comes to light, it is all that any of the parties can require."

And in the case of Third Nat. Bank of New York v. Merchants' Nat. Bank, above referred to, O'Brien, J., lucidly expressing the reasoning of the court, says:

"But a claim of negligence, based upon a failure to discover, is very different from one based upon a failure, after discovery, to give notice. A failure to discover, though resulting in loss to another who might, if sooner apprised, have apprehended the forger, and recovered the money, gives no right of action; and for obvious reasons, one of which alone need be mentioned. There is no duty imposed on one who receives a forged check from another to unearth the crime. He receives it presuming, as he has a right to do, that all the signatures and indorsements are genuine, which is implicitly warranted by the person from whom it is received. This presumption, and the right to rely on this implied warranty, are only destroyed when, by inspection, the forgery could be detected because apparent on the face of the check or bill, or where, from the surrounding circumstances, the suspicions of the person receiving the note, check, or bill should be aroused, and his scrutiny challenged. Not so after discovery, for then the duty is incumbent on the one detecting the imposition to act promptly in giving notice, and, if he fails therein to the injury and damage of the one entitled to notice, he will be prevented from recovering the damage or injury shown to have been actually incurred."

There being no proof of the defendant's negligence or lack of reasonable diligence in giving notice of the forgery after its discovery, or, even if such were shown, that any damage was suffered thereby, the plaintiff cannot, in my opinion, avoid his liability to refund.

For these reasons the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

(27 App. Div. 125.)

THROCKMORTON v. EVENING POST PUB. CO.

(Supreme Court, Appellate Division, First Department. March 11, 1898.)

1. LIBEL—EVIDENCE.

In an action against a newspaper for publishing a statement that plaintiff, an army officer, was then suspended, a letter of plaintiff's friend to the editor, before the publication, stating that the sentence of the court-martial had been remitted, and plaintiff permitted to retire from the army, was admissible to show malice, as it was sufficient to require the paper to ascertain the truth before publishing the statement.

2. SAME—HEARSAY.

In an action against a newspaper for publishing a false statement that plaintiff, an army officer, was then suspended, a letter of plaintiff's friend to the editor, giving the writer's opinion of plaintiff's good character, and purporting to contain copies of letters of other persons certifying to the same effect, was mere hearsay and opinion, and its admission prejudicial error warranting a reversal.

Appeal from trial term, New York county.

Action by Charles B. Throckmorton against the Evening Post Publishing Company for libel. From a judgment entered on a verdict for

plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and PATTERSON, O'BRIEN, McLAUGHLIN, and INGRAHAM, JJ.

Lawrence Godkin, for appellant.

John N. Lewis, for respondent.

McLAUGHLIN, J.   This action was brought to recover damages alleged to have been sustained by the plaintiff by the publication of two articles in a newspaper known as the Evening Post, published by defendant in the city of New York.   Two separate and distinct causes of action were set out in the complaint:   (1) The publication on the 7th of January, 1895, in the editorial columns of the Evening Post, the following matter concerning the plaintiff:   "He had not been connected with the supply department of the regular army, but with the pay department, and he had been tried and found guilty by court-martial for irregular performances in connection with certificates and funds intrusted to him."   (2) The publication on the 15th of January, 1895, in the news columns of the Evening Post, the following concerning the plaintiff:   "The major is suspended from the army on account of the court-martial's findings."   The defendant interposed an answer, and justified the publications by alleging that it was true in substance and in fact; that the plaintiff had been tried and found guilty by court-martial for irregular performances in connection with certificates and funds; and that by reason thereof he was suspended from the army. It appeared upon the trial that on the 20th of November, 1891, the plaintiff, then an officer in the United States army, was tried by court martial upon two charges:   (1) Conduct unbecoming an officer and a gentleman; and (2) knowingly causing to be presented for payment a false and fraudulent claim against the United States,—and found guilty of both, and sentenced "to be dismissed from the service."   The findings of the court-martial were thereafter submitted to President Harrison, then president of the United States, and on the 26th of the following March the proceedings, findings, and sentence were approved by him; but, in view of mitigating circumstances, the sentence was modified to "suspension from rank and command, with forfeiture of half pay for the period of five years."   On the 7th of March, 1894, so much of the sentence as then remained unexecuted was remitted by President Cleveland, and on the day following the plaintiff was permitted to retire from active service in the United States army.   The trial court, at the conclusion of plaintiff's case, dismissed the complaint as to the first cause of action, but held that there was a question for the jury as to the second cause of action alleged, viz. "the major is suspended from the army on account of the court-martial's findings."

The publication set out in the second cause of action alleged was not true, because it stated that the plaintiff then was suspended from the army, and, as we have already seen, the sentence imposed had been remitted.   Upon the trial the plaintiff was permitted, against the objection and exception of the defendant, to read in evidence a letter, written by a friend of the plaintiff's, Mr. Garrison, and delivered by him in 1894 to one of the editors of the Post.   So much of this letter as stated·

that the sentence of the court-martial had been remitted, and that the plaintiff had been permitted to retire from the army, was admissible for the purpose of showing malice, because this information of itself was sufficient to require the defendant, before it published the statement, to ascertain whether the sentence of the court-martial, as modified by President Harrison, had thereafter been reversed, modified, or remitted, either in whole or in part. The balance of the letter, however, was, upon every well-recognized rule of evidence, inadmissible, and it should have been excluded upon the defendant's objection; certainly upon its motion to strike out. The letter, as a whole, was subject to about every valid objection that could be urged against improper evidence. It was objectionable because it contained hearsay evidence; because it assumed to give the opinion of the writer concerning the plaintiff; because it purported to give copies of letters written by third parties in behalf of the plaintiff, recommending him to a public position, and certifying as to his good character, ability, etc. The reception of this letter was error (Bank v. Delafield, 126 N. Y. 410, 27 N. E. 797; Thomas v. Gage, 141 N. Y. 506, 36 N. E. 385), and necessitates a reversal of the judgment. The writer, after commenting at length upon the proceedings of the court-martial and the subsequent action of President Harrison and President Cleveland, proceeded to quote from certain letters written by prominent persons recommending the plaintiff to a public position, which he then held, as follows:

"C. P. Huntington does not hesitate to recommend him. Frederic R. Coudert writes: 'Major Throckmorton is an old army officer of conspicuous merit, and whose record of gallantry and good service during the last thirty years is excellent.' Hon. S. B. Elkins, secretary of war under the late administration, writes: '* * * Without going into details, I beg to state that at the time of the court-martial I was secretary of war, and gave most careful consideration to the proceedings and findings of the court. In my opinion, * * * the findings did him injustice. * * * Major Throckmorton's fine record as an officer in the army is a sufficient guaranty of his ability to discharge the duties of the position he seeks.' Ex-Secretary Tracy writes: 'I reached the conclusion that the most that was established against him was a technical violation of the army regulations. This even was the result of a misunderstanding. No fraud or attempt to defraud was proved against him, and nothing that could be deemed as a reflection against his integrity. * * * I regard him as preeminently qualified for the position in your department, and believe that his appointment would give great satisfaction both to yourself and the people of the city.' Lastly, Secretary Proctor, under whose administration the court-martial was held, writes: '* * * I have several warm personal friends in whom I have the utmost confidence, who have been intimate friends of Major Throckmorton for many years, who give the very strongest testimony as to his honorable conduct and character. Although for a time not able to meet his current expenses promptly, I am informed that every obligation was paid very soon; that no one lost a dollar by him, or was long delayed.'"

These opinions did not bear upon the issue being tried, but they were calculated to, and I have no doubt did, prejudice the jury. The minds of the jury would naturally be diverted from the real issue, and they might well be inclined to discredit the evidence of the defendant where so many prominent persons had given certificates of plaintiff's character.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event. All concur.